IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION


SAINT LOUIS UNIVERSITY, A          )
MISSOURI BENEVOLENT CORPORATION,   )
                                   )
              PLAINTIFF,            )
                                   )
                                   )
              vs.                  ) Case No.  4:07-CV-1733-CEJ
                                   )
AVIS MEYER,                        )
                                   )
              DEFENDANT.           )
                                   )
- - - - - - - - - - - - - - - - - - - - - - - - - - -


BEFORE THE HONORABLE CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE
MOTION HEARING
AUGUST 20, 2008


COURT REPORTER:        GARY BOND, RMR, RPR
                       THOMAS F. EAGLETON COURTHOUSE
                       111 S. TENTH STREET, THIRD FLOOR
                       ST. LOUIS, MISSOURI 63102
                       314.244.7980

1                         APPEARANCES

2

3

4    FOR THE PLAINTIFF:

5                        LEWIS, RICE & FINGERSH
                         BY:   FRANK JANOSKI, ESQ.
6                              BRIDGET HOY, ESQ.
                         500 N. BROADWAY, SUITE 2000
7                        ST. LOUIS, MISSOURI  63102-2147
                         314.444.7600
8                        FJANOSKI@LEWISRICE.COM

9

10   FOR THE DEFENDANT:

11                       POLSTER, LIEDER, WOODRUFF & LUCCHESI,
                         L.C.
12                       BY:   BRIAN GILL, ESQ.
                               NELSON NOLTE, ESQ.
13                       12412 POWERSCOURT DRIVE
                         SUITE 200
14                       ST. LOUIS, MISSOURI  63131
                         314.238.2400
15

16

17

18

19

20

21

22

23

24

25

ST. LOUIS, MISSOURI; AUGUST 20, 2008

2:30 a.m

THE COURT:  Good afternoon.  I was not planning on getting together with you all again so soon but here we are.  And I trust that each of you brought your clients with you, Mr. Janoski?

MR. JANOSKI:  Yes, I did.

THE COURT:  Who did you bring you?

MR. JANOSKI:  I brought Mr. Kenneth Fleischmann.  He is one of the counsel in the Office of the General Counsel for St. Louis University.

THE COURT:  All right.  Thank you.  And are you Dr. Meyer?

MR. MEYER:  I am

THE COURT:  All right.  Normally, I don't have the attorneys bring their clients with them to these hearings; but I have some concerns that I thought would be best addressed if the parties-in-interest were present.  So that's the reason I asked you all to come.

I wanted to have this hearing because again, normally, I don't have hearings on discovery issues.  One of the discovery issues that has been raised involves whether or not there's been a waiver of the attorney-client privilege; and I thought it would be helpful to hear some more from you on that issue, rather than simply relying on what you've put

1  in your written papers.

2         And as long as I was going to hear that issue, I

3  thought maybe it would make sense to address some of these

4  other discovery issues at the same time.  So let's take up

5  the interrogatories first, because I think we can get through

6  those pretty quickly.  Oh, and there is also the spoliation

7  issue that I think needs to be addressed as well; but I want

8  to take about these interrogatories.

9         And my sense is that there really isn't much of a

10  dispute about whether the answers that were given to the

11  interrogatories were complete or accurate.  Am I right?

12  Okay.  Don't everybody speak at once.

13         MR. JANOSKI:  Your Honor, we would agree.  I don't

14  believe that they are complete.  I don't believe that they

15  are accurate, and I believe that our memorandum supports that

16  in the citation.  You will recall that when we were here the

17  last time that we asked for an extension of time, so that we

18  could use Dr. Meyer's deposition testimony.  And I believe

19  that that deposition testimony supports the fact of our

20  contention that they were not complete; and that they were

21  not accurate.

22         THE COURT:  Okay.

23         MR. GILL:  I believe that his answers were based on

24  his good-faith knowledge and understanding and instruction of

25  the interrogatory questions during the deposition.

1          THE COURT:   Hold on.   I'm talking about the

2    interrogatories now; not the deposition.   Can you stand at

3    this podium?  And tell me again:   You're Mr. Gill?

4          MR. GILL:   Yes.

5          THE COURT:   Okay.

6          MR. GILL:   The interrogatory answers were answered

7    by Dr. Meyer on, you know, his interpretation of the

8    structure of the questions in the sense that other answers

9    were provided later on.   Yes, technically, they wouldn't be

10   complete; but they were answered on, you know, his good-faith

11   knowledge and belief and interpretation of those questions.

12         THE COURT:   Well, I know that's what is the

13   explanation that's offered for at least one of the questions;

14   one of the interrogatories.   But I mean are you saying he

15   misunderstood all of them?

16         MR. GILL:   He did not misunderstand all of them

17   With respect to Interrogatories 2, 4, and 9, he misunderstood

18   the structure of those questions.   And based on the subparts

19   and such forth in the answer, himself and Diana Banantes

20   (phonetic) as having knowledge and, you know, communication

21   about these Articles of Incorporation papers.

22         With respect to 12, yes, it is an omission in the

23   sense that he did, as a panel, do a radio broadcast with

24   respect to a variety of subjects about charters of school

25   papers; and it was an omission.   And, again, it was clarified

1    in the deposition.

2           THE COURT:  Okay.  Well, see, that doesn't really

3    solve the problem  Because, first of all, if Dr. Meyer

4    misunderstood a question or wasn't clear to him -- and I am

5    sorry to talk about you in the third person, Dr. Meyer -- but

6    if there was anything that wasn't clear, then he should have

7    talked to you and asked for clarification.

8           And certainly with respect to these interviews, I

9    mean that wasn't a vague question.  It is like, you know,

10   "Who have you talked to in the media about this?"  I mean it

11   is pretty clear to me what the question asks for.  And the

12   other thing too is the fact that a party gives a more

13   complete answer in a deposition doesn't cure the deficiency

14   in the answers to the interrogatories.

15          The parties are entitled to full Answers to

16   Interrogatories.  You can't just say, "Well, I'll just give

17   them so much now.  And then when they take my deposition,

18   I'll tell them the rest."  It doesn't work like that.  So,

19   you know, I think, again, there is no dispute that these were

20   not complete interrogatory answers.  And whether they were

21   incomplete because of Dr. Meyer's misunderstanding or his

22   lack of recollection, that only goes to whether or not he

23   should be sanctioned for this.

24          But these are incomplete answers, obviously, because

25   he gave additional information in his deposition that clearly

indicates that he didn't give that same information in his
Answers to Interrogatories.  And the discovery is not
something that's to be taken flippantly, and I expect that
when you all send interrogatories to each other or the
Requests for Production of Documents that the parties -- not
just the lawyers -- but that the parties themselves operate
in good faith in trying to answer the questions or produce
the information as fully and completely as possible.

        None of this, you know, half-stepping.  You know, I
hope not to ever see this kind of a motion again.  I hope
there's never any situation that would give rise to this kind
of a motion again.  You all are experienced lawyers.  You
know how to do discovery, and it's incumbent on you to make
sure that your clients understand that they don't get to be
flippant or arrogant or play around with this, because I
don't like it.

        It doesn't move this case forward, and that's what
everyone has an interest in.  That's what I have an interest
in, and this kind of thing just wastes time and money.  Okay?
Okay.  Well, I'm going to grant the plaintiff's Motion to
Compel.  The defendant will have 15 days from today to submit
to the plaintiff Supplemental Answers to Interrogatories;
answers that fully respond to the interrogatories.  And, Dr.
Meyer, if there's anything that you don't understand about a
question, if you find that something is not phrased clearly,

1  then your job is just do your very best to give the

2  information that you think is being asked for.  And,

3  sometimes, it's better to give more information than less.

4  Okay?

5          MR. MEYER:  Yes, ma'am

6          THE COURT:  All right.  Now, on the issue of

7  sanctions, do you want to be heard on this, Mr. Janoski?

8          MR. JANOSKI:  Yes, Your Honor.

9          THE COURT:  All right.

10          MR. JANOSKI:  On this issue with respect to

11  sanctions, I guess we would be asking for two things:  One is

12  once we get the interrogatory answers complete, that we have

13  an opportunity to evaluate them  And if there needs to be an

14  additional deposition with regard to the information that we

15  would get, that we have that opportunity.

16          The second thing that we would ask in the way of

17  sanctions is for our attorney's fees in filing the motion and

18  attending this hearing today.

19          THE COURT:  Well, that's fine.  I'm going to leave

20  open the issue of sanctions for now.  That's not to say that

21  I am leaning one way or the other.  But I'll give you the

22  opportunity to submit whatever additional requests for

23  sanctions you believe are appropriate; and I'll determine

24  whether any amount will be awarded.

25          MR. JANOSKI:  I understand, Your Honor.

1              THE COURT:   Okay.

2              MR. JANOSKI:   Is there a particular time as to when

3    you would like to have that?

4              THE COURT:   Sooner rather than later.

5              MR. JANOSKI:   Okay.   We can do sooner rather than

6    later.

7              THE COURT:   Well, you know, I can't give you a

8    deadline --

9              MR. JANOSKI:   Right.

10             THE COURT:   -- because I don't know --

11             MR. JANOSKI:   Right.

12             THE COURT:   -- when you'll know.

13             MR. JANOSKI:   Right.

14             THE COURT:   But I have no doubt that you will be

15   diligent in submitting whatever information you want me to

16   consider.

17             MR. JANOSKI:   Yes.   And then would it be okay once

18   we get the answers to evaluate them?  And then how would you

19   like us to approach the Court, if we feel that we need

20   additional time in a deposition for that?

21             THE COURT:   Has the discovery period ended?

22             MR. JANOSKI:   It's very close, and we do have an

23   agreement about some extensions to wrap things up.   But I

24   think it might be at the end of this month that that would

25   be.   I know that trial is not until December.   So I don't

1     know that it's a great issue.

2          MS. HOY:  It's August 18th, Your Honor.

3          THE COURT:  Oh, that was two days --

4          MR. JANOSKI:  Two days ago.

5          THE COURT:  Two days ago.

6          MS. HOY:  In the Order, there was an agreement that

7     Mr. Janoski was provided some additional time to wrap things

8     up.

9          THE COURT:  Well, if you're not able to reach any

10    agreement on extending the discovery period to allow for any

11    additional deposition that you feel is warranted, then you

12    can make that request to me; and I'll consider it.

13         MR. JANOSKI:  Okay.

14         THE COURT:  I hope that you all will be able to come

15    to some understanding about that.

16         MR. JANOSKI:  I would hope so, Your Honor.  Thank

17    you.

18         THE COURT:  Okay.  All right.  So that was Document

19    Number -- I don't know.  It's the plaintiff's Motion to

20    Compel.

21         Now, the second issue is the attorney-client

22    privilege issue raised in the plaintiff's Motion to Compel

23    discovery.  Let me ask you this.  And I'm not sure which one

24    of you is going to address this issue, Mr. Janoski or

25    Miss Hoy:  Why do you feel that these questions are relevant

1   and what relevance do they have to the issues involved in

2   this case?

3           MR. JANOSKI:  Well, first of all, Your Honor, we

4   think that the fact that there was an interview -- and there

5   has been no denial of these statements -- constitutes a

6   waiver of the attorney-client privilege.

7           As to these particular statements, we think that it

8   may go to whether or not the defendant had willfully -- and

9   we think he did -- willfully did the conduct that he did;

10  what conduct that there may have been on this.  And we don't

11  think, Your Honor, based on the In Re: Grand Jury case that a

12  defendant or any party can take a snippet for one purpose and

13  just say, "Okay.  The privilege is just waived for those

14  particular words."

15          We think -- and the case suggests and states -- that

16  it's the whole conversation that gets waived; not just that

17  portion of conversation.  And that's why I asked Mr. Meyer or

18  Dr. Meyer in his deposition about What else was discussed

19  during that meeting that he had with his lawyer, so that

20  there may be other information as it relates to the other

21  issues and those particular issues also involved in this case

22  that we may learn from

23          Now, if he doesn't remember, we may have to go to

24  attorneys' notes or things of that nature; and I understand

25  that the waiver of attorney-client is something that the

Court takes very, very seriously in this.  But I think that in this case it was very clear, and it is not just limited to the couple of snippets that were there that he tried to use to bolster his position with the public.  He waived it for all purposes for the conversations that he had with his counsel.

THE COURT:  Okay.  Mr. Gill?

MR. GILL:  The complaint calls for adoption of a benevolent society's name, trademark infringement, unfair competition.  And so our argument is that these brief statements to the press are not even relevant to a benevolent society's name or use of a trademark or unfair competition.  So, you know, these statements aren't relevant.

And I agree with opposing counsel that, you know, the privilege can't be used as a sword and a shield, but I don't think even to that step in the analysis, because I don't think that they are relevant.  And just because of the complaint and the allegations of use, and there's been no use in commerce.  So, you know, our first level here is, you know, these aren't relevant statements with respect to the counts of adoption and trademark infringement.

THE COURT:  You get the last word on this.

MR. JANOSKI:  Thank you, judge.

THE COURT:  And I'll tell you:  I don't see the relevance here yet.  I mean, I just don't see it.  Because I

mean the claim here is the trademark infringement and what
discussions Dr. Meyer had with his attorneys since this
lawsuit began.

MR. JANOSKI:  Right.  But the issue also, Your
Honor -- and it goes a little broader -- is that this just
can't be a selective waiver.  And we would ask the Court to
look at the In Re: Grand Jury case and, you know, we get the
whole conversation on this.

THE COURT:  Well, I'll tell you this:  I think that
these comments could certainly be construed as a waiver of
the attorney-client privilege.  I am not saying they should
be.  I said that they could be construed as that.  And I
think that anyone who's represented by counsel should be more
cautious in statements that they make to the press or to the
public about discussions that they've had with their lawyer.

But putting aside for the moment whether there's
been a waiver of the privilege, I mean let's assume that
there was, it's still a question of relevance.  And I mean
that's the ultimate question in discovery, and I don't know
how any of this would be reasonably calculated to lead to
discoverable information.

MR. JANOSKI:  Well, certainly, we think, Your Honor,
that the first one.  And, you know, certainly and I would say
perhaps the last one that we're done talking and now posed to
go to court perhaps not, although we think goes farther than

these words; that he waived the entire meeting with his
lawyer is what he did.

You know, we have these rules, and we have rules of
court and Rules of Evidence; and, you know, they are there
for a particular purpose. And they're also there to protect
the party. But the party can't have his cake and eat it too
when it comes to waiver of the attorney-client privilege.
And so when he takes a snippet that goes out there to try to
make himself look better in the public and in an interview or
something like this, you know, he gets the good with the bad
and the bad.

And the bad is that he's now waived the entire
conversation; and I get to learn and my client gets to learn
about the entire conversation. And, certainly, you know,
where he says that his attorney thinks that the fact that
he's a tenured professor may have played a part in the
lawsuit, I get to then ask him all their understandings about
the lawsuit. He brought the lawsuit into that. I didn't.

And so I do think that it goes a little farther than
maybe the exact words that are in here, but it is also a
waiver of the entire conversation, because then you would
have parties out there that, you know, will do things like
this and quote from their attorney and say, "Well, it is only
that little portion that's there." The waiver of the
attorney-client privilege is a serious thing.

 1              And as the Court just, you know, stated that when
 2      you do that, you know, you better be careful what you're
 3      doing.  And so I would say, you know, you take the good with
 4      the bad:  He got what he wanted out of those interviews.  Now
 5      he has to pay the consequences for that.
 6              THE COURT:  Okay.  All right.  Well, there appear to
 7      be three statements that Dr. Meyer made that I'm not sure if
 8      they were all made at the same time or to the same person.
 9      But one has to do with that his attorney thinks the fact that
10      he's a tenured professor may have played a part in the
11      lawsuit.
12              The second is that his lawyers speculated that the
13      university was using a lawsuit as a way to revoke Dr. Meyer's
14      tenure.  And, finally, that the lawsuit was believed to be a
15      personal vendetta.  And I guess there was an e-mail
16      communication to a student or someone about, "We are done
17      talking, and we are now poised to go to court in December."
18              MR. JANOSKI:  Your Honor, if could say one more
19      thing?
20              THE COURT:  Yes.
21              MR. JANOSKI:  And I apologize.
22              THE COURT:  All right.
23              MR. JANOSKI:  I guess the other point here is if he
24      would have discussed this with a third party as to his
25      strategy going forward, that certainly would have been

1  relevant and discoverable.   And that's what he did here:

2  Even though it was a conversation and he was relaying a

3  conversation to attorney, he said it to a third party; and

4  that's why it is relevant and discoverable.   It talks about

5  their strategy.

6          THE COURT:   The strategy -- I am sorry -- in which

7  comment?

8          MR. JANOSKI:   Well, as to being, you know, playing a

9  part, you know, and being a part of the lawsuit as part of

10 this -- well, his lawyer thinks that that is, you know,

11 playing a part in the lawsuit.   Let's see which one is it

12 here?

13         I would say it was probably that one that goes more

14 towards the strategies that were going on between him and his

15 lawyer.   But again, Your Honor, it is that it's the entire

16 conversation that gets waived; not just a portion of the

17 conversation that gets waived.

18         THE COURT:   Okay.

19         MR. GILL:   May I speak?

20         THE COURT:   Go ahead.

21         MR. GILL:   If we go through the scenario that

22 opposing counsel has, you know, with respect to if there was

23 a waiver, you know, I still believe what they're asking for

24 would be too broad, based on words like "thinks, speculated,

25 and believed."

1    And I think it would just exceed the scope of any

2    waiver, and we're not admitting that there was a waiver.   You

3    know, statements like "court in December" are more of a fact.

4    I mean that's part of the Scheduling Order.   Again, we just

5    don't think this rises to the level of relevance.

6    THE COURT:   Well, again, these comments were

7    probably not well-advised.   And I think that, you know,

8    again, whether or not there was a waiver of the

9    attorney-client privilege I'm not sure that I want to even

10   get to that issue, because I don't see the relevance that

11   communications between Dr. Meyer and his attorney would have

12   on the issues involved in this case.

13   Also, I mean I would be very reluctant to find a

14   broad waiver of attorney-client privilege based on these

15   limited comments, one of which happens to -- and as Mr. Gill

16   pointed out -- happens to be a statement of fact.   "You know,

17   we're going to trial in December."   That's true.   "We're done

18   talking."   Apparently, that's true too.

19   And, you know, and the other comments about, "Well,

20   my lawyer thinks this is a vendetta by the university or

21   they're trying to get rid of me," I'm not sure that every

22   off-the-cuff remark -- and I think that's what these really

23   come down to -- I don't think that every off-the-cuff remark

24   should be, even if it could be construed as a waiver of the

25   privilege, should be construed as a waiver of the privilege

1       for everything.   All discussions between attorney and client.

2               I think to make that finding would be much too broad

3       a conclusion to reach.   But, as I said before, if you are

4       represented by counsel, you need to be very cautious about

5       the things that you say to the public and particularly when

6       you are attributing those comments to statements that were

7       made to you by counsel, because it very well could be that

8       these statements will be used as a wedge to open the door to

9       further communications.   So I'm going to deny the plaintiff's

10      Motion to Compel discovery based on the waiver of the

11      attorney-client privilege.   Again, I hope this issue doesn't

12      come up again.   If it does, then I might have a different

13      view of it.

14              All right.   Now, the last issue has to do with

15      spoliation of evidence.   And as I understand it, there were

16      some written documents that may have been destroyed or not

17      preserved; is that right?

18              MR. JANOSKI:   They were destroyed.   It's admitted.

19              THE COURT:   Okay.

20              MR. JANOSKI:   Especially after we sent a litigation

21      letter we had sent.

22              THE COURT:   And there was an e-mail message or

23      messages or perhaps some kind of -- was there a memo or a

24      letter?

25              MR. JANOSKI:   This is a lot of things, Your Honor --

1          THE COURT:   Okay.

2          MR. JANOSKI:   -- since the litigation started.   I

3  guess, you know, I start off here with this is probably one

4  of the more incredible things I've come across as a lawyer,

5  where there is no dispute that there was a destruction of

6  documents.   Whether they be e-mail; whether they be a letter

7  that was drafted; whether they be written correspondence that

8  was received by the defendant, the defendant systemically and

9  intentionally destroyed those documents after the party

10  having received a Litigation Hold Letter with the filing of

11  the lawsuit.

12          And the testimony during the deposition was that, on

13  a regular basis, he destroyed documents and communications

14  between him and third parties.   Whether he sent them to them

15  or he received it from them, he destroyed those documents.

16  And it was intentional that he did that.   This was not a

17  corporation that has a regular, "Let's clean out the e-mail

18  policy" that someone who is a litigant may not be able to

19  control immediately or stop.

20          But here it was an individual.   And, again, we sent

21  a Litigation Hold Letter, where we were very specific.   And

22  we've attached that as an exhibit to this.   We were very

23  specific.   And in spite of that, again, during the

24  deposition, if it was something that was more than three

25  months old, I was told it has been destroyed.

1    Now, that really frustrates the process, because as

2    courts have identified, once it's gone, you don't know if you

3    can get it back.  You can try and get it back, but you don't

4    know if you can get everything back.  And the fact that this

5    was done, you know, just absolutely intentionally, you know,

6    flagrantly cavalierly that these things were done I think

7    calls for the harshest sanction that is available in this

8    case.

9    We haven't received -- except for the couple of

10   documents that were in the Secretary of State's office -- we

11   haven't received any other documents from the defendant:  Not

12   an e-mail; not a communication.  You know, he claims that he

13   was drafting or had drafted a letter to me to give us

14   assurances that he wasn't going to do anything more with

15   these trademarks that we have a dispute.

16   Well, I never received a letter.  It's never been

17   produced.  Apparently, if it existed, it was destroyed.  Now,

18   that's going to be on the C drive.  That's not just like just

19   going to your e-mail.  You went, and you intentionally did

20   that.  So we don't know what is out there; what other

21   communications are out there.

22   We've kind of put together some bits and pieces from

23   things that we have seen on blogs, and that's how we found

24   out about the other communications.  But, you know, it just

25   goes completely against our litigation process for someone to

destroy things, and that's why I think some courts have been
very harsh with regard to the sanctions.  And, you know, in
cases, there have been defaults that have been entered in the
case, because there is no real way to fix this.

And so, you know, when I asked him for a
justification, he said that it just didn't occur to him to
keep the correspondence.  We sent a letter.  We tried to make
sure everybody knew.  There was a proposed scheduling plan
that had in it a statement that we were going to preserve all
documents.  It shouldn't have been a surprise to anybody that
we were expecting to see all the correspondence involved in
this case.

And now, we don't.  And because I think it was done
so intentionally, the only inference that this Court can take
from that is that there were communications in there that
were not in the best interests of the defendant that we'll
now not know, unless I guess we could scour the country.  But
we wouldn't know whether we found it or out, because the
other people don't have the same obligation as the defendant.

So I think that, you know, this is to me and affront
to the Court.  When we do things like this, we notify them
We want to make sure that the process works, and someone just
flagrantly goes into their computer; deletes e-mails; throws
away written correspondence that they receive and then
correspondence that they allege.  And, again, he went to the

1    newspaper or one of these interviews and said, "Well, I had
2    given their lawyer assurances." Well, where is it?
3          Well, if it was created, it's now been destroyed.
4    And we just think that the harshest sanctions in this case --
5    because this is the most egregious case of spoliation that I
6    can find -- and that those are the sanctions that the Court
7    should exercise on the defendant.
8          THE COURT:  All right.  Thank you.
9          MR. GILL:  Your Honor, there is a lot to cover in
10   this in the sense that his deposition is clear with respect
11   to communications and e-mails that he has a 30-year
12   relationship with students and alumni about this paper and
13   about his activities as a professor.
14         And the testimony was clear that he deletes every 90
15   days e-mails that come in from the wealth and passion that he
16   from his students and alumni.  These e-mails on his testimony
17   said if anything relates to was, "How are you doing?  How's
18   the charter with the newspaper?"  You know, "How is this
19   lawsuit going?"  And his response was innocuous in the sense
20   that these e-mails and correspondence that he deletes didn't
21   have anything to do with use, commerce, or the facts
22   underlying the circumstances of this case.
23         He has admitted that he deletes just on his personal
24   timetable his e-mails with students and alumni.  But his
25   testimony is such that these e-mails, they don't rise to what

1  this complaint is about; and that's use and commerce or

2  adoption of a benevolent society's name.

3      You know, counsel talks about courts applying harsh

4  sanctions for the most egregious act of spoliation here.  On

5  his testimony, he states he's not technically savvy.  He

6  doesn't do blogs.  He doesn't know to access.  His testimony

7  is he doesn't do blogs.  He is not technical.  You know, he

8  is not a technology person.

9      Counsel keeps saying that, "Yes," courts should

10 sanction egregious acts of spoliation for communications that

11 have to do with the underlying causes of assertions or

12 accusations of the case.  They rely on the <u>Alexander</u> case,

13 just as an example of these harsh sanctions.  In, <u>Alexander</u>,

14 an antitrust case, a company was literally moving documents

15 from warehouses to homes to different locations and just

16 finally destroying documents.  Okay?  Of course, the Court

17 characterized that as the "admitted bonfires."

18      Here, the documents with respect to what he

19 testified to, these are correspondence he has with his

20 students and with his alumni and such forth.  And they just

21 don't relate, and they are not relevant to a "use in

22 commerce."  And let's go to that step.  Let's say, you know,

23 as an adverse inference, that some of these e-mails that were

24 deleted or communications that were deleted dealt with the

25 use in commerce.  You know, the baseline trademark of

1    jurisprudence is that you have to show the offending mark

2    with the use in commerce.

3              And any e-mail between a student wouldn't show this

4    use in commerce.   He is stipulating in the testimony and he

5    has testified that he filed these incorporation papers to

6    reserve this name should the students revoke the charter and

7    then should the students decide to go off-campus and then

8    should the students decide to even use this name.   Once they

9    accept the charter, he dissolved these incorporation papers.

10             Again, he admits he deletes e-mails, because they

11   weren't relevant to this case; and his testimony is clear on

12   that.

13             THE COURT:   Okay.   Let me just say this:   Of all the

14   motions, this is the one that I find the most troublesome,

15   because it does involve admitted destruction of

16   communications.   And whether Dr. Meyer thought they were

17   important or not or relevant or not, he doesn't get to make

18   that decision.

19             After being put on notice that communications

20   regarding this case have to be retained and then you get

21   communications about the case, and you don't retain them

22   Well, that's not right.   And we only have Dr. Meyer's word as

23   to what was in those communications, because they don't exist

24   any more.   They've been deleted.

25             It may be possible to find out from the people who

wrote to him, you know, what they wrote. But, you know, I'm not sure that we even know who those people are. Apparently, there were a number of people that he had contact with; and we don't know what he wrote back. I think in the defendant's response, you refer to -- and this on page four -- "Letters of support from the students who are aware of the litigation are questioning me about why it's happening; what's going on." That sort of thing. I think that's a quote from the deposition.

You know, that may generally describe what was in the content of these communications but certainly doesn't describe it very specifically. Also, what Dr. Meyer's response was to these people who were writing to him, we have no idea what that was. And I don't think that the defendant can say, "Well, these documents weren't relevant." We don't know that.

And the whole point of holding onto these things is that so that there can be some decision about whether they're relevant or not. If you had them and they weren't relevant, then you could make that objection and, you know, have some determination made about the relevance of the documents. But you don't have the documents. And all we have is apparently Dr. Meyer's recollection of what was in them. He didn't remember word for word of what was written to him or what he may have written back to people. You can't reproduce this

1   information.

2           I just don't understand why this happened.   I mean I

3   don't think that, once you are given notice of the litigation

4   and the obligation to retain information, that you just can

5   disregard that.   So this is very troubling to me now.   You

6   know, whether or not it merits the sanction to the extent of

7   entering a default judgment, I don't know.   I'm not sure

8   about that.   Yes?

9           MR. GILL:   If I may?   The e-mails -- these

10  communications -- there is no harm, because there still needs

11  to be, you know, an independent evidentiary record of

12  commercial, you know, use of a mark.   So, you know, with

13  respect to stated assurances that he thought he gave, there

14  is no harm to the plaintiff, because it just wouldn't rise to

15  the use in commerce.   And neither would these, you know,

16  deleted e-mails.

17          And, again, you know, this case is about adoption

18  and use of trademarks.   And there is just no harm with

19  respect to these, you know, deletions of e-mails, which were

20  innocuous in his belief.   I mean there was no fraudulent

21  intent or desire or any suppression of the truth, because

22  there hasn't been any use.   And so these e-mails,

23  understandably, you know, only he can testify as to what they

24  were.   But there still hasn't been any use shown.   And so

25  there would be no harm, and the sanctions wouldn't rise to

1    any, you know, requisite, fraudulent intent to suppress truth

2    and then prejudice the opposing party because, again, the

3    ultimate prejudice would be use of this mark.  Thank you.

4          THE COURT:  All right.  Well, all right.  I think I

5    have a pretty good idea of what happened here.  And I will

6    take this motion under advisement, because, as I said before,

7    I do find it troubling about the documents having been

8    deleted or destroyed in the face of the notice of this

9    lawsuit.  It just doesn't make any sense at all.  Yes?

10         MR. JANOSKI:  May I?  Not to belabor too much, but I

11    think that the argument that Mr. Gill makes here is the

12    entire problem  And as the Court has identified, we now have

13    only Dr. Meyer's word, because we don't know what else had

14    been done.  He says that these were just communications.  We

15    don't know what was attached to those communications; what

16    else happened with regard to those communications.

17         We are all at a loss, and we've lost the evidence

18    involved here.  And, again, I didn't stress enough the fact

19    that a Litigation Hold Letter was sent out and delivered to

20    defendants; that it is just incredible that this would then

21    occur.  And that's why we're stuck, and that's why I think

22    that the courts have said that I mean the harshest inference

23    has to be -- you know, there is no justification, because

24    this can be no assurance to us in that regard.  And then I

25    would also say that we look at that and we look at the

1  interrogatory answers and we look at the way those things

2  were done, I just think that now it's become impossible or

3  near impossible.

4      St. Louis University has been prejudiced here in

5  trying to go forward with its case, because the evidence has

6  been destroyed; and the only inference that we can get from

7  that is that some of that evidence was going to be adverse to

8  Dr. Meyer.  Thank you, Your Honor.

9      THE COURT:  All right.  All right.  That's fine.  I

10  think I've heard enough on this.  I'll have a ruling on your

11  Motion for Sanctions on Spoliation issue shortly.

12      Okay?  Before you go, let me just reiterate:  I am

13  very concerned about this case, because of some of the issues

14  that have come up.  A few months ago, it was the issue

15  regarding the neutral who was going to be selected for your

16  ADR.  And now we've got these discovery issues that really

17  could have been avoided.  And so, we still have a few months

18  to go before trial.  I don't know where you all stand with

19  your mediation; if it's over.  Have you all completed that?

20      MR. JANOSKI:  Yes.

21      THE COURT:  Unsuccessfully, I assume?

22      MR. JANOSKI:  (Shakes head.)

23      THE COURT:  Okay.  No surprise there.  But,

24  obviously, we are going to proceed as if there's going to be

25  a trial.  If there is one, you know, that's fine.  But you

1    all have really got to get past some of this silliness and
2    focus on getting this case ready for trial.  It doesn't help
3    anyone to be dilatory, regardless of what your personal
4    feelings may be toward.
5          I don't know whether the university has a vendetta
6    against Dr. Meyer or if he's got a vendetta against the
7    university.  I don't care.  You all are going to have to get
8    this case ready for trial and not get bogged down in
9    personalities.  And you need to take these issues seriously,
10    because I take discovery very seriously; and I think that the
11    parties need to as well.  So I hope that I don't see you
12    again until the trial.  All right?  We're be in recess.
13
14          (Proceedings concluded at 3:22 p.m)
15
16                        *    *    *
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA                          )
                                                  )    ss:
EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION    )

## C E R T I F I C A T E

I, Gary Bond, Certified Shorthand Reporter in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings had the 20th day of August, 2008, in the above mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 through 29 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 4th day March, 2009.


                              /s/ Gary Bond
                              Gary Bond, RPR, RMR
                              Certified Shorthand Reporter